UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JAMES A. HURST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1:14-cv-01250-LJM-DML |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Defendant. | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff James A. Hurst ("Hurst") requests judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), which denied Hurst's application for Disability Insurance Benefits ("DIB") benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416 & 423.

Hurst argues that the administrative law judge ("ALJ") failed to adequately consider Hurst's extreme obesity, that the ALJ erred in his credibility determination, and that the ALJ made an error at step five in determining the jobs available to Hurst. The Commissioner denies that the ALJ erred in any way.

### I. BACKGROUND

### A. PROCEDURAL HISTORY

Hurst initially filed an application for DIB on December 2, 2011, alleging an onset date of February 25, 2011. R. at 133. His application was denied on March 7, 2012, and again upon reconsideration on May 23, 2012. R. at 57-58. On June 27, 2012, Hurst submitted a request for reconsideration by an ALJ. R. at 86. His request was granted on July 3, 2012. R. at 78.

A video hearing was held on March 13, 2013. R. at 31. Hurst appeared and testified in Indianapolis, Indiana, with his attorney, Michel L. Starkey ("Starkey"), present. *Id.* The ALJ presided in Falls Church, Virginia. Vocational expert, Barry Brown ("VE"), also appeared and testified by phone. *Id.* On April 11, 2013, the ALJ denied Hurst's application. R. at 10. On April 21, 2013, the Appeals Council denied Hurst's request for review of the ALJ's decision. R. at 5. Hurst filed this complaint with the Court on July 25, 2014. Dkt. No. 1, at 1.

### B. AGE, EDUCATION, WORK HISTORY & HURST'S PERCEPTION OF HIS IMPAIRMENTS

Hurst was 46 years old at the time of the hearing and had a high school degree. R. at 32. Prior to his alleged onset date, Hurst's relevant work experience included work at a canning factory, followed by eleven years at a paper mill. R. at 45. At the canning factory, Hurst ran a machine that filled the cans and put the lid on top. *Id.* He was required to stand while doing this job, which usually required no heavy lifting, although he would occasionally help unload trucks. *Id.* At the paper mill, Hurst testified that he ran a press machine that made paper that was corrugated to make boxes. R. at 47. He also had to stand to do this job and would occasionally have to drag wet, heavy paper out from underneath the machinery, but not always. R. at 45-46. He estimated that this heavy lifting totaled up to 40-50 pounds at a time. R. at 47. Hurst stated that he left his job at the paper mill because back pain due to his weight made it difficult to get up every day. R. at 32-33.

Hurst testified at the hearing that he is 5'5" to 5'6" and weighs about 500 pounds. R. at 33. He was not sure of his exact weight because most doctor's scales only go up to 500 pounds. *Id.* The last time he was weighed exactly, his weight was "490-something." *Id.* Hurst's primary care physician, Eric Betts, M.D. ("Dr. Betts"), once sent him to another

doctor to get treatment for his weight "years ago," but Dr. Betts had not made any special efforts in the past two or three years to remedy Hurst's obesity. R. at 39-40. Hurst testified that Dr. Betts did continually encourage him to lose weight and Hurst claimed that he had tried to lose weight, but it usually resulted in him gaining weight. R. at 40. These efforts usually focused on a change in diet, which Hurst reported: "work[ed] for awhile," but that he would eventually "fall off the wagon." *Id.* He testified that these were usually diets he tried on his own, not diets from a prescribed plan or book. *Id.*

As of the hearing, Hurst was prescribed to six medications for a variety of medical issues, including cholesterol regulation, high protein, diabetes, arthritis pain and inflammation, and depression. R. at 38-39. He testified that, overall, the medications helped "a little bit." R. at 39. He reported that he was "pretty much" able to take care of his personal needs himself, including bathing, dressing, and going to the bathroom. *Id.* He testified that he was unable to tie his own shoes or put on socks, so he wore slip-on shoes without socks. R. at 43. He stated that he does not smoke, but admitted to using chewing tobacco "constantly." R. at 39. About a year prior to the hearing, Hurst had a pulmonary function test performed because he was experiencing shortness of breath. R. at 40-41. The test found that Hurst had sleep apnea, for which he uses a CPAP machine every night. *Id.*

Hurst lived with his mother, who was home all of the time and who, according to Hurst, did most of the household chores. R. at 34. Hurst testified that he did no gardening, yard work, or mowing. R. at 35. He testified that he sometimes emptied his trashcans, which did not require that he bend over. R. at 42. He also sometimes cooked simple meals, but very rarely did dishes because it hurt his back to stand that long. R. at 36. If

he did, he had to lean on the counter to alleviate the stress of his weight on his body. *Id.* He claimed that he could only stand an average of two or three minutes or walk maybe 50 or 100 feet before having to sit down due to back pain. R. at 41-42. Hurst claimed that even sitting could be uncomfortable because some chairs cut off circulation to his legs due to his weight. R. at 42. At home, Hurst preferred to sit on the edge of his bed. *Id.* Hurst could use the computer from this position, which he would only use for an hour or two at a time. R. at 43. Hurst testified that his computer use often included listening to music on YouTube, playing games, and reading the newspaper. R. at 35. He also watched TV in his bedroom, where he said he spent most of his time. R. at 34. In addition to these activities, he sometimes read books, helped his nephew with homework, and sat on the porch when it was nice outside. R. at 34-35.

Hurst testified that he had not driven in approximately four years, despite having a valid license, because he did not fit behind the wheel of his Blazer, which he consequently sold for the money. R. at 37. If he did any kind of shopping, it was online. R. at 37. If Hurst got out of the house, it was likely because his friend picked him up and took him back to his house to watch TV or to a drive-in movie. R. at 37. He was able to ride in other people's vehicles, although he sometimes was unable to use seatbelts because they were not big enough. R. at 43.

### C. RELEVANT MEDICAL EVIDENCE

#### 1. <u>Treatment Records</u>

Hurst first presented to Dr. Betts on August 25, 2008. R. at 219. Over the next month, Dr. Betts prescribed the following medications to Hurst: Tramadol and Naproxen for his back pain, Wellbutrin XL for his depression, a CPAP machine for his "severe" sleep

apnea, and Metformin for his type-two diabetes. R. at 218-19. On April 25, 2011, Dr. Betts added Lisinopril for kidney health to Hurst's medication regime, R. at 229; and on July 19, 2011, he added Simvastatin for high cholesterol. R. at 228.

Hurst saw Dr. Betts regularly between 2008 and the hearing, during which time Dr. Betts and Hurst regularly discussed Hurst's back pain and his needing to lose weight, among his other health impairments. R. at 226, 231. Notably, on July 26, 2010, Dr. Betts noted that Hurst was not going to his diabetes classes as recommended, R. at 225; and, on October 17, 2011, Dr. Betts recorded that Hurst was not walking much. R. at 220.

On April 18, 2011, Dr. Betts ordered diagnostic imaging of Hurst's spine in response to complaints of neck pain and left arm numbness and tingling. R. at 230. The x-rays revealed the following: "There is a mild levoscoliosis. There are degenerative changes with narrowing of cervical interspaces. Of the C5-6 interspace appeared narrowed and there is hypertrophic end plate remodeling." *Id.* Dr. Betts concluded: "Definite arthritic changes to account for pain. Watch for now." *Id.*

On February 8, 2013, Dr. Betts submitted a medical source statement, which opined that Hurst could sit for two hours at a time, stand for 30 minutes, and walk for fifteen minutes without interruption. R. at 322. Dr. Betts further opined that Hurst could sit a total of seven hours in an eight hour day and stand or walk for one hour in an eight hour day. R. at 323. In terms of postural limitations, Dr. Betts opined that Hurst could never do any of the following: climb stairs and ramps, ladders or scaffolds, stoop, kneel, crouch, or crawl. R. at 324. Dr. Betts opined that Hurst cannot "walk a block at a reasonable pace on a rough or uneven surface." R. at 325. Dr. Betts advised against Hurst's exposure to

the following: unprotected heights, moving mechanical parts, dust, odors, fumes, pulmonary irritants, and extreme heat. *Id.*

On January 9, 2012, Hurst presented to Kristin Perrone-McGovern, Ph.D., HSPP ("Dr. Perrone-McGovern"), for a psychological evaluation. R. at 235. Hurst explained to her that he had gained 100 pounds over the last four years and felt "very irritable" all day during that time. R. at 235. He reported feelings of hopelessness and low self-esteem. *Id.* He denied excessive worrying, panic attacks, manic symptoms, or suicidal or homicidal ideations. *Id.* Dr. Perrone-McGovern conducted a mental status examination and made the following observations:

> Responses to the mental status examination indicated claimant was oriented times four and had intact immediate and autobiographical memory. Responses suggested mild impairment in recent and remote memory. Claimant's basic calculation abilities were intact. His ability to complete tasks requiring sustained attention was within normal limits. Responses suggested his abstract reasoning and judgment were largely intact.

R. at 238. She opined that Hurst was "likely to work at a slower than average pace." *Id.* She also opined that he "likely possesse[d] the skill to create and manage a budget." *Id.*

## 2. Social Security Administration Consultative Exams

On January 17, 2012, state medical consultant, Kari Kennedy, Psy.D. ("Dr. Kennedy"), opined after reviewing the record that Hurst's mental impairments were not severe. R. at 239. Dr. Kennedy identified these impairments as dysthymia, R.at 242, and an eating disorder. R. at 246. She rated Hurst's restrictions of activities of daily living, his difficulties in maintaining social functioning, and his difficulties in maintaining concentration, persistence, or pace all as "[m]ild." R. at 249. She noted no episodes of decompensation. *Id.* On May 18, 2012, this assessment was affirmed by reviewing state medical consultant, Joelle J. Larsen, Ph.D. ("Dr. Larsen"). R. at 282.

6

On January 28, 2012, Hurst presented to state medical consultant, Kristina Jiner, M.D. ("Dr. Jiner"). R. at 253. Dr. Jiner noted Hurst's complaints of back pain, fatigue, and shortness of breath. *Id.* She observed that his "[l]ungs are clear to auscultation bilaterally without crackles, rhonchi, or wheezing." R. at 255. She was unable to perform an abdominal exam as Hurst was unable to lie supine on the exam table. *Id.* She noted that his neurologic signs and muscle strength and coordination were normal. R. at 255-56. She observed "1-2+ pitting edema of bilateral ankles and dorsum of feet." R. at 255. She opined that his fatigue and shortness of breath are likely secondary to his morbid obesity, although she did not observe either symptom during the exam. R. at 256.

On March 7, 2012, state medical consultant, A. Dobson, M.D. ("Dr. Dobson"), opined, after reviewing the record, that Hurst could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk at least 2 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. R. at 270. Dr. Dobson additionally opined that Hurst could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. R. at 271. On May 23, 2012, this assessment was affirmed by a reviewing state medical consultant, J. Sands, M.D. ("Dr. Sands"). R. at 238.

### D.  VOCATIONAL EXPERT TESTIMONY

The VE testified that Hurst's past relevant work included: machine packager at the canning factory, medium, unskilled; and machine presser at the paper mill, medium, unskilled. R. at 48-49.

The ALJ posed the following hypothetical residual functional capacity ("RFC") to the VE, assuming someone in their mid-40's with a high school education:

> [A]ssume the hypothetical individual can only on an occasional basis do things like climb stairs, balance, stoop, kneel, crouch, crawl, and assume

7

> the person cannot climb ladders or similar devices, or work in hazardous environments. Now, when I say hazardous environments, I do mean to include working at heights or around dangerous machinery. But when I say dangerous, I'm not including in this things like riding in a car or doing ordinary things around the house. But I also want to include . . . limitations involving exposure to high concentrations of dust, fumes, gases, and other pulmonary irritants, but again not including in this things they should encounter while riding in a car or doing ordinary things around the house.

R. at 49. The VE responded that this individual could not perform Hurst's past relevant work, however, the VE found that this individual could find jobs in significant numbers in the Indiana and national economies at both the light and sedentary exertional levels. R. at 50. At the light exertional level, the VE gave the following examples: office helper, 5,800 jobs in Indiana and 350,000 nationally; and merchandise marker, 10,000 in Indiana and 400,000 nationally. *Id.* At the sedentary level, the VE gave the following examples: clerical support, 1,900 in Indiana and 150,000 nationally; machine tender, 500 in Indiana and 24,000 nationally; and assembler, 200 in Indiana and 35,000 nationally. R. at 50-51.

The ALJ altered his original hypothetical to an individual who had to additionally "avoid temperature extremes or extremes of wetness and humidity." R. at 51. The VE responded that this additional restriction would not limit the hypothetical individual from being able to do the jobs discussed above. *Id.* The ALJ altered the hypothetical again to an individual "who is restricted to the performance of routine and repetitive tasks . . . by which I mean tasks that may have several steps or details involved, but they would not be complicated or hard to remember." R. at 51-52. The VE again responded that this additional restriction would not limit the hypothetical individual from being able to do the jobs discussed above. R. at 52.

The ALJ altered the hypothetical a final time to an individual who "were off-task, say, about a fourth of the work day – that's two hours out of the work day, during which

8

time the person would not be able to focus effectively on even routine tasks. Or in the case of absenteeism, assume two or more absences a month." *Id.* The VE responded that either of these additional restrictions would render the hypothetical individual unable to hold any of the jobs discussed above. *Id.*

Hurst's attorney, Starkey, cross-examined the VE and asked if the sedentary job numbers would be affected if certain postural limitations were added, including no climbing stairs, no kneeling, crouching, crawling, or stooping, and just occasional balancing. R. at 53. The VE responded that, although the DOT code said that the sedentary jobs have no postural limits, his professional experience indicated that some sedentary positions required some of these acts on at least rare occasions. *Id.* He thus reduced the office helper positions by 50% to 2,900 jobs in Indiana and 175,000 nationally. *Id.* He reduced the machine tender and assembler jobs by 20% each, leaving 400 machine tender jobs in Indiana and 19,200 nationally; and 160 assembler jobs in Indiana and 28,000 nationally. R. at 54.

### E. RELEVANT ASPECTS OF THE ALJ'S DECISION

At Step I, the ALJ determined that Hurst met the insured status requirement. R. at 15. At Step II, the ALJ determined the Hurst had not engaged in substantial gainful activity from the alleged onset date of February 25, 2011, through the date of last insured of December 31, 2012. *Id.* At Step III, the ALJ determined that Hurst suffered from the following severe impairments: "obesity with back pain, cervical spondylosis, diabetes mellitus, chronic obstructive pulmonary disease ("COPD"), and an eating disorder." *Id.*

At Step IV, the ALJ determined that Hurst's impairment or combination of impairments were insufficient to meet a listing. R. at 17. He noted that Hurst is 5'6" and

weighs 500 pounds, resulting in a body mass index ("BMI") of 80.7. *Id.* The ALJ stated that he considered the effects of Hurst's obesity pursuant to SSR 02-1p, which provides guidance for evaluating obesity in a disability claim. *Id.* The ALJ nonetheless found that Hurst's impairments were insufficient, specifically addressing listing 1.04, disorders of the spine; listing 9.00, endocrine disorders; and listing 3.02, pulmonary insufficiencies. *Id.*

As to listing 1.04, the ALJ found "no evidence of nerve root compromise with appropriate neurologic abnormalities; spinal arachnoiditis confirmed by an operative note or pathology report; or lumbar spinal stenosis resulting in pseudoclaudication and resulting in inability to ambulate effectively." *Id.* He gave limited weight to Dr. Betts' opinion that Hurst "cannot walk a block at a reasonable pace on rough uneven surfaces" because Dr. Betts also noted that Hurst had normal gait in multiple examinations. *Id.*

Listing 9.00 establishes disability if there is evidence that the effects of diabetes mellitus satisfy one or more of the listed impairments for other body systems, which is absent here. *Id.* And although the pulmonary function test showed some breathing obstruction, it did not reach the level required to meet listing 3.02 according to the ALJ. *Id.*

At Step V, the ALJ found that Hurst could perform sedentary work as defined in 20 C.F.R. § 404.1567(a), with the following limitations:

> [H]e was able only occasionally to climb, balance, stoop, kneel, crouch, or crawl; he could not climb ladders and similar devices; and he could not work in hazardous environments; and he was not able to work in temperature extremes or at high levels or humidity or wetness.

R. at 18. Representative occupations of such sedentary work with those postural limitations available to Hurst, according to the VE, include office helper, machine tender, and assembler. R. at 53-54.

To formulate this RFC, the ALJ determined that Hurst's medically determined impairments could cause his symptoms, but not to the extent alleged by Hurst based on his non-compliance with treatment and that the function reports and medical evidence suggest that he is not as limited as he alleges. R. at 19-20. The ALJ also notes that there is nothing in the actual medical record to suggest that Hurst's regime of medication has not helped alleviate his symptoms. R. at 20.

Hurst argues that the ALJ failed to adequately consider Hurst's extreme obesity, that he erred in his credibility analysis of Hurst, and that he erred at step five in determining jobs available to Hurst.

## II. **STANDARD**

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A). To determine whether or not a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

I.    If the claimant is employed in substantial gainful activity, the claimant is not disabled.

II.    If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

III.    If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

IV.    If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

> V. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, but then it shifts to the Commissioner at the fifth step. *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673; *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Craft*, 539 F.3d at 673 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Nelson*, 131 F.3d at 1234.

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). *See also*, *Craft*, 539 F.3d at 673. Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. *See also*, *Craft*, 539 F.3d at 673 (stating

that not all evidence needs to be mentioned, but the ALJ "must provide an 'accurate and logical bridge' between the evidence and the conclusion" (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004))). An ALJ's articulation of his analysis enables the Court to "assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review." *Craft*, 539 F.3d at 673.

### III. ANALYSIS

Hurst argues that the ALJ failed to adequately consider Hurst's extreme obesity, that he erred in his credibility analysis of Hurst, and that he erred at step five in determining jobs available to Hurst.

#### A. HURST'S EXTREME OBESITY

Hurst argues that the ALJ failed to sufficiently consider his obesity in combination with his other impairments as required by the regulations. Dkt. No. 17, at 6. "[The Social Security Administration] will consider the combined effect of all of [the plaintiff's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. In his opinion, however, the ALJ stated that he gave consideration to Hurst's obesity pursuant to SSR 02-1p, which gives adjudicators additional guidance on evaluating obesity and its potential effects on the rest of the body, and proceeded to address why Hurst failed to satisfy the listings for disorders of the spine, endocrine system, and pulmonary insufficiencies. Dkt. No. 12-2, at 18.

In his analysis of listing 1.04, disorders of the spine, however, the ALJ supported his conclusion that the listing was not met by assigning "limited weight" to the opinion of Hurst's treating physician, Dr. Betts, that Hurst "cannot walk a block at a reasonable pace on rough or uneven surfaces." *Id.* According to listing 1.04, a disorder of the spine can be

manifested by an inability to ambulate effectively, an example of which is "the inability to walk a block at a reasonable pace on rough or uneven surfaces." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Here, Hurst contends that the ALJ failed to provide good reasons for assigning only "limited weight" to the opinion of Dr. Betts according to 20 C.F.R. § 404.1527(c)(2), especially because Dr. Betts had treated Hurst since 2008 and was his treating physician. Dkt. No. 17, at 8. The Court agrees. The ALJ reasoned that Dr. Betts' assessment was inconsistent with his observations of Hurst as having "normal gait." Dkt. No. 12-2, at 18. This reasoning ignores the issue of Hurst's obesity entirely. Additionally, the Commissioner failed to address Hurst's concern regarding the ALJ's discrediting of Dr. Betts' opinion in her brief. The issues of the ALJ's weighing of Dr. Betts' opinion, as well as Hurst's spinal impairment in consideration of his obesity, therefore, must be remanded for reconsideration.

Along with it, the ALJ should reconsider and give more explanation as to how Hurst's obesity does or does not affect his other impairments, including his diabetes mellitus and COPD. For instance, it is insufficient to simply state: "Although the pulmonary function tests showed some breathing obstruction, they were not to the level required to meet the listing." Dkt. No. 12-2, at 18. This conclusory statement does not explain how Hurst's condition fails to meet the "level required," which is undefined, and ignores the issue of his obesity entirely.

### B. CREDIBILITY DETERMINATION

Hurst also disputes the ALJ's determination that Hurst is not credible. Dkt. No. 17, at 10. Hurst asserts that the ALJ relies on two improper inferences to make this determination: that Hurst has been non-compliant with treatment, *Id.*, and that Hurst's

activities of daily living ("ADLs") are inconsistent with his alleged disability. Dkt. No. 17, at 12.

The ALJ found that Hurst's medically determinable impairments could cause his alleged symptoms, but not to the extent alleged by Hurst. Dkt. No. 12-2, at 20. The ALJ begins his reasoning by stating:

> When asked about whether he had sought treatment for his obesity, Mr. Hurst indicated that he had gone to the doctor and that diets were recommended, but they were unsuccessful. However, there is little or no evidence in the record documenting any significant attempts at dieting.

*Id.* Hurst argues, and the Court agrees, that non-compliance with treatment for obesity is not a valid inference on which to base a credibility finding in this case. Dkt. No. 17, at 10. First of all, Dr. Betts never prescribed a weight loss regime to Hurst according to the regulations. SSR 02-1p states: "A treating source's statement that an individual 'should' lose weight or has 'been advised' to get more exercise is not prescribed treatment." Dr. Betts encouraged Hurst to lose weight, but never made any statements or prescriptions more concrete than this. And second, no weight loss regime could be counted on to work for Hurst, even if one had been prescribed. SSR 02-1p identifies individuals with a BMI over 40 as level III, which is the highest level of obesity. Hurst had a BMI of 80.7. R. at 17. Generally, obesity surgery is the recommended course of treatment for level III obese individuals. SSR 02-1p. Granted, surgery was never suggested to Hurst, who was left to lose weight on his own. "People with extreme obesity, even with treatment, will generally continue to have obesity. Despite short-term progress, most treatments for obesity do not have a high success rate." *Id.* Although Hurst's claims that he attempted to diet cannot be substantiated by weight loss results, this is not sufficient to discredit his subjective claims of back pain and other symptoms.

The ALJ also points to Hurst's failure to comply with Dr. Betts' recommendations that he quit chewing tobacco, attend diabetes classes, and regularly check his blood sugar as grounds for the ALJ's credibility determination. Dkt. No. 12-2, at 20. Social Security Regulation 82-59 states: "[The Social Security Administration] may make a determination that an individual has failed to follow prescribed treatment only where . . . [it] is clearly expected to restore capacity to engage in any [substantial gainful activity] (or gainful activity, as appropriate)." SSR 82-59. The ALJ fails to show that these recommendations were intended to restore Hurst's capacity to any significant degree. Hurst's failure to comply is not, therefore, a valid basis for an adverse credibility finding.

The ALJ's second reason for his credibility finding is the inference that Hurst's ADLs are inconsistent with his alleged disability, which Hurst also contends is improper. The ALJ gave a basic list of Hurst's ADLs, without mentioning his limitations, before concluding:

> At the hearing the claimant testified that he relies on his mother to do most of the household tasks, but the medical evidence does not suggest that the claimant is so limited as to be unable to do more household activity. It is particularly noteworthy that physical examination findings during the consultative examination were minimal; the claimant was able to move around the room without difficulty, and his gait was normal without any assistive device (Exhibit 4F).

Dkt. No. 12-2, at 21. The physical examination referenced was conducted by Dr. Jiner, who, in the same report, noted chronic back pain, a mildly restricted range of motion in Hurst's lumbar spine, and pitting edema in his ankles. R. at 255-56. She was also unable to conduct an abdominal examination because Hurst was unable to lay supine on her examination table due to his obesity. *Id.* The ALJ's conclusions that her physical

examination findings were "minimal" and that Hurst was able to "move around the room without difficulty" were, at the least, overstated.

The ALJ's conclusion that Hurst's ADLs were inconsistent with his alleged disability was also based on the "limited weight" assigned to the opinion of treating physician, Dr. Betts, as discussed above. Dkt. No. 12-2, at 21. Here, the ALJ discredits Dr. Betts because he found that Dr. Betts' opinion that Hurst could only sit for two hours at a time was inconsistent with Hurst's own account that he could "sit without difficulty for hours at a time." *Id.* This summation of Hurst's testimony is inaccurate. Hurst stated at the hearing that "sitting or laying" were the most comfortable positions for him. R. at 42. When asked if he had any issue with sitting upright for a period of time, he responded: "Sometimes. It depends on the chair that I'm sitting in, to be honest. With my weight, some hard chairs will cut the circulation off to my legs." *Id.* He said that he would sit on the edge of his bed most of the time at home. *Id.* From that position, he could use the computer, but he would only do so for an hour or two at a time. R. at 43. Nothing in Hurst's testimony is inconsistent with Dr. Betts' opinion, which, again, must be reweighed on remand.

Further, the ALJ misrepresented Dr. Jiner's examination notes and Hurst's testimony in order to discredit Hurst and Dr. Betts to support his conclusion that Hurst's ADLs are inconsistent with Hurst's alleged disability. Social Security Regulation 96-7p requires that the ALJ clearly articulate his credibility analysis:

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave the individual's statements and the reasons for that weight.

SSR 96-7p. On remand, the ALJ should take care to identify Hurst's statements and his reasons for the weight given to those statements based on specific evidence from the record, keeping in mind the critical differences between ADLs and the activities of a full-time job. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Specifically, the Court would like to see more attention given to the ALJ's assessment of a sedentary RFC in light of Hurst's statement that many chairs cut off circulation to his legs due to his obesity. *See Browning v. Colvin*, 766 F.3d 702, 707 (7th Cir. 2014). Similarly, more attention should be given to the ALJ's RFC assessment that Hurst "was able only occasionally to climb, balance, stoop, kneel, crouch, or crawl," R. at 18, in consideration of Hurst's claim that he could not tie his own shoes or put on socks, but wore slip-on shoes without socks instead due to his obesity. R. at 43.

### C.     STEP FIVE ERROR

Hurst argues that the ALJ erred in concluding that there were sedentary jobs in significant numbers that Hurst could perform. Dkt. No. 17, at 13. Hurst contends that he is reliant on his mother to live and could not move away from Portland, Indiana, which has a total population of 6,000, to find work. *Id.* As such, it was error that the ALJ failed to consider his limited transportation options because it is well established that he cannot drive due to his obesity. *Id.* In response, the Commissioner contends that under the Social Security Act, it does not matter whether or not the specific jobs provided by the VE are available to Hurst:

> We consider that work exists in the national economy when it exists in significant numbers either in the region where [the applicant] live[s] or in several other regions of the country. It does not matter whether . . . [w]ork exists in the immediate area in which [the applicant] live[s] . . . [whether a] specific job vacancy exists for [the applicant]; or . . . [whether the applicant] would be hired if [the applicant] applied for work.

20 C.F.R. § 404.1566. Yet in *Browning*, the Seventh Circuit stated:

> The peculiarity of this case is that it is the claimant's disability that makes the number of jobs in the region or the nation irrelevant, because it prevents her from moving. That immobility is a consequence of the disability, and so needs to be factored into the analysis of job availability.

*Browning*, 766 F.3d at 708. On remand, the ALJ must consider whether or not Hurst's impairments do indeed prevent him from living independently from his mother. If it is found that they do, according to Seventh Circuit precedent, then his immobility must be factored into the ALJ's analysis of job availability.

In regards to the jobs provided by the VE, Hurst also points out that "clerical support" is not a job listed in the Dictionary of Occupational Titles ("DOT"), however, # 209.587.010, the code provided by the VE for this job, corresponds with "addresser." Dkt. No. 17, at 13. This job is described as follows: "[a]ddresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing. May sort mail." U.S. D. O.T., Dictionary of Occupational Titles, § 209.587-010 (4th ed. 1991). Hurst opines that this position has likely been replaced by secretaries and computers. Dkt. No. 17, at 13. The Seventh Circuit has stated:

> If the only jobs that the applicant is physically and mentally capable of doing no longer exists in the American economy (such as pin setter, phrenologist, leech collector, milkman, pony express rider, and daguerrotypist), the applicant is disabled from working, and likewise, as a realistic matter, if there is an insignificant number of such jobs.

*Hermann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014). This reasoning would apply here, however, Hurst raised the issue too late. The ALJ is entitled to rely on the VE's testimony if it is not questioned at the hearing. *Donahue v. Barnhart*, 279 F.3d 441, 446-447 (7th Cir. 2002). The ALJ did not err by including this job in his analysis.

## IV. **CONCLUSION**

For the reasons stated herein, the Court **REMANDS** this action for further proceedings consistent with this opinion. Judgment shall be entered accordingly.

IT IS SO ORDERED this 30th day of July, 2015.

						_____
						LARRY J. McKINNEY, JUDGE
						United States District Court
						Southern District of Indiana

Distribution:

Meredith E. Marcus
DALEY DISABILITY LAW, PC
mmarcus@fdaleylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov